Filed 7/30/21

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LUIS JAVIER MORALES, JR.,<br><br>     Defendant and Appellant. | A157644<br><br>(Contra Costa County<br>Super. Ct. No. 51709906) |

      Defendant Luis Javier Morales, Jr. fired six shots in the direction of a parked, occupied car, resulting in the death of his pregnant acquaintance who stood in the street near the car. The jury convicted Morales of two counts of first degree murder, one count of attempted murder, one count of shooting at an occupied vehicle, and one count of possession of a firearm by a felon. The jury also found true four firearm use enhancements under Penal Code[1] section 12022.53, subdivision (d) (section 12022.53(d)), and a multiple murder special circumstance allegation (§ 190.2, subd. (a)(3)).

      Morales contends: (1) the prosecutor committed prejudicial misconduct in closing argument and his counsel was ineffective for failing to object thereto; (2) the attempted murder conviction must be

---

     \* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part B, D, and E of section II, *post*.

     [1] All further statutory references are to the Penal Code unless otherwise stated.

reversed because there was insufficient evidence to support a kill zone jury instruction, and the instruction given was legally erroneous; and (3) with respect to the firearm use enhancement found true on count 1, Morales was deprived of due process by the court's failure to instruct that the requisite great bodily injury or death under section 12022.53(d) must be to a person other than an accomplice.

Morales also raises the following sentencing challenges: (1) the court erred in imposing two terms of 25 years to life for first degree murder (counts 1 and 2), along with a life without the possibility of parole (LWOP) term for the multiple murder special circumstance finding; (2) remand is required to allow the trial court to exercise its discretion under section 12022.53, subdivision (h) (section 12022.53(h)) to strike the firearm use enhancements; and (3) the sentencing and youthful offender parole provisions of sections 3051, 1170, subdivision (d)(2)(A)(i) (section 1170(d)(2)), and 190.5, subdivision (b) violate equal protection principles. We modify Morales's sentence on counts 1 and 2 and the special circumstance finding to reflect two LWOP sentences, and we reverse the true finding on the section 12022.53(d) firearm use enhancement as to count one. We otherwise affirm the judgment.

## I.  BACKGROUND

Based on Morales's act of firing six shots at the occupants of a parked car and the resulting deaths of a young woman who stood near the car and her unborn baby, Morales was charged with two counts of murder with a multiple murder special circumstance allegation and firearm use enhancements (§§ 187, subd. (a), 190.2, subd. (a)(3), 12022.53, subds. (b), (c) & (d)) (counts 1 and 2); attempted murder with firearm use enhancements (§§ 664, 187, subd. (a), 12022.53, subds. (b),

2

(c) & (d)) (count 3); shooting at an occupied vehicle with a firearm use enhancement (§§ 246, 12022.53, subd. (d)) (count 4); and possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 5). A jury found Morales guilty as charged and made true findings for the special circumstance allegation and the section 12022.53(d) firearm use enhancements.

The trial court sentenced Morales to a term of LWOP on the special circumstance allegation and to two consecutive terms of 25 years to life for each murder. The court imposed but stayed the four 25 years-to-life terms for the firearm use enhancements associated with counts 1 through 4; a term of 7 years for attempted murder; a term of 1 year and eight months for shooting at an occupied vehicle; and a term of eight months for the felon in possession of a firearm conviction. Morales timely appealed.

### A. The Prosecution's Case

In September 2016, 18-year-old Ilaysia M. was seven months pregnant with Deandre L.'s child. Deandre L. had ended the relationship and had a new girlfriend, Maria M. Ilaysia M. was upset over the end of the relationship, so, on September 5, Ilaysia M., her cousin Maria U., and their friends, Joselin E. and Carla G., drove around looking for Deandre L. and Maria M. to confront them. Maria U. planned to fight Maria M.

The women saw Deandre L. and Maria M. at a bus stop near Deandre L.'s house. Before the women could get out of their car, however, Deandre L.'s friend, Gustavo D., picked the couple up in his Cadillac. When Gustavo D. drove away, the women followed. They spotted Gustavo D.'s car in a market parking lot. The women pulled

3

into the parking lot and got out of the car; Maria U. went to Maria M.'s door, hit the window, and told her to open the door. Maria U. and Maria M. started fist fighting.

Elias Q., who was in the front passenger seat of Gustavo D.'s car, got out, and, according to Joselin E., tried to hit or push Ilaysia M. At trial, Elias Q. denied trying to hit or push Ilaysia M., but admitted that he had pushed Maria U. "away." Deandre L. also intervened and called Ilaysia M. and her friends "bitches." After the fight ended, Deandre L. and Elias Q. told the women to come over to Deandre L.'s house, and Joselin E. testified that Elias Q. made a gun gesture with his hand.

Ilaysia M. and her friends were angry and upset, and one of them decided to call Morales, whom Joselin E. was casually dating, on Joselin E.'s cell phone. The women told Morales about the fight, including that Deandre L. had called them names and that Elias Q. had tried to push Ilaysia M. They asked Morales to accompany them to Deandre L.'s house, and they talked about wanting to fight.

The women then met Morales, who was with Luciano D. and Deepak N., at the corner on Bush Avenue. One of the women asked the men to "slide" over to Deandre L.'s house. "Slide" can imply something violent. At Bush Avenue, defendant got out of his black Nissan and went inside a nearby residence to go get something. Maria U. saw defendant holding a black gun in the street at Bush Avenue and 21st Street.

The two cars then went to Ilaysia M.'s grandmother's house, and the plan became to go to Deandre L.'s house. The word "slide" was used again. Maria U. told police that Morales said he was "going to slide on" Deandre L. Joselin E. told police that she saw Luciano D. with a gun

4

that day before going to Deandre L.'s house. The women knew that Morales had a gun and knew that Luciano D. had one on that occasion. The women wanted Morales and his companions to bring their weapons and go with them to Deandre L.'s house, where they were going to pick a fight. The women drove to Deandre L.'s house, and the three men did as well in Morales's car.

When the women arrived at Deandre L.'s house, Gustavo D.'s Cadillac was parked next to the sidewalk in front of Deandre L.'s driveway, and Gustavo D. and Elias Q. were in the car. Elias Q. testified that another person, Jason, was also in the Cadillac, and he believed that Jason was in the car when the fight occurred earlier at the market. Maria U. also said that Jason was in the Cadillac when they arrived at Deandre L.'s house. Gustavo D., however, testified that Jason was not in the Cadillac when the women arrived at Deandre L.'s house. Gustavo D. sat in the driver's seat and Elias Q. in the front passenger seat of the Cadillac. Elias Q. said Jason was in the backseat. The boys were smoking synthetic marijuana, and Deandre L. and Maria U. had gone inside Lowe's house.

Joselin E. stopped her car in the middle of the street facing the opposite direction from Gustavo D.'s car. Maria U. asked Gustavo D. if he "had a problem with" her, and, as she spoke, Ilaysia M. got out of the car, "walk[ed] up to" Gustavo D., and asked where Deandre L. and Maria M. had gone. By Gustavo D.'s account, all of the women were aggressive and started "screaming" and demanding to see Maria M. He testified it was clear they wanted to continue the confrontation.

At some point, Morales, Luciano D., and Deepak N. arrived in Morales's black Nissan. Gustavo D. and Joselin E. testified that

5

Morales drove by in a black car after the women parked. Gustavo D. testified that Morales parked his car 30 to 40 yards behind Gustavo D.'s car, facing the same direction as the women's car. Gustavo D. and Elias Q. could only see Morales's car by turning around or looking in the rearview mirrors.

Ilaysia M. stood near the driver's side window of Gustavo D.'s car with her body facing him. As they spoke, Maria U.—who had returned to Joselin E.'s car—saw Morales and Luciano D. get out of Morales's car. Maria U. testified that she saw Morales point his gun in the direction of the Cadillac. She did not hear anything before Morales shot. Gustavo D. also saw Morales shoot, and Gustavo D. and Maria U. saw sparks from Morales's gun as it fired. Joselin E., who sat in the driver's seat of her car, dropped down but saw one bullet come from the front of her car across and pass on the side; the bullet came from the direction of Morales's car. A neighbor testified that she heard several gunshots in quick succession. Elias Q. counted four or five shots. San Pablo's ShotSpotter system—a network of audio-recording devices placed throughout the city that detect the sound of gunfire and "geolocate" its origin—detected six gunshots at 7:56 p.m., at 17th Street and Post Avenue.

At the sound of gunfire, Gustavo D. testified that he opened the driver's side door and fled from the car. He saw Morales shooting as he fled. Elias Q. opened the door on the other side of the car and also "ran for [his] life." They both hopped the fence to Deandre L.'s backyard and waited for the police to arrive. Elias Q. testified that Jason ran from the car as well, but he did not see him again that day. As he jumped over the fence, Gustavo D. heard the women screaming.

6

The women panicked when they heard gunshots. Maria U. told Ilaysia M. to get in the car, but it was too late. Ilaysia M. was face-down on the ground. The women called 911. Morales fled the scene immediately after the shooting.

Police responded to the scene within one minute of the ShotSpotter notice. Paramedics also arrived and took Ilaysia M. to the hospital. Both the baby and Ilaysia M. died. Ilaysia M. was hit by a single bullet that caused significant organ and tissue damage, and she died as a result of the gunshot. The baby died from lack of oxygen resulting from maternal blood loss.

During evidence collection that night, Officer Biama found six .40-caliber spent cartridges at the intersection of Post and 17th Street, 169.4 feet from Ilaysia M.'s body. All but one of the cartridges were "partially crushed," consistent with having been stepped on or driven over. A ballistics expert determined that the six cartridges were from the same gun. Officer Biama searched near Gustavo D.'s car and in Deandre L.'s front yard, but did not locate any casings there. Police did not discover evidence of gunfire in or on the Cadillac.

## B. The Defense Case

Jesus Valencia lived near DeandreL.'s house in San Pablo and heard two gunshots on the evening of September 5. "Very little" time passed between the first and second shot. Valencia testified that the two shots sounded differently, leading him to believe they came from different guns.

On cross-examination, the prosecution's ShotSpotter expert testified that the system can have trouble registering sounds from lower caliber guns, like .22 calibers.

Deepak N. testified that, on the day of the shooting, he was with Morales and Luciano D. They met Ilaysia M. and the other women at Ilaysia M.'s grandmother's house, but he did not recall meeting on Bush Avenue. Deepak N. considered the women to be close friends. The women told Morales, Luciano D., and Deepak N. about the fight at the market. Ilaysia M. wanted to go to Deandre L.'s house to cause problems, with Morales, Luciano D. and Deepak N. acting as their "protection," which Deepak N. understood to mean accompanying the women and "[j]ust being there." Ilaysia M. asked the men to come to Deandre L.'s house "[o]nce or twice," and Deepak N. testified that the women wanted to go start a fight. However, Ilaysia M. told Morales, "Don't shoot," and Deepak N. said that Morales did not want to go.

Nonetheless, the group went to Deandre L.'s house on 17th Street. Deepak N. sat in the backseat and Luciano D. in the front passenger seat of Morales's car. Morales's .40 caliber gun was on the center console. Morales stopped in front of Post Avenue just before the crosswalk. Their car was "a ways away" from the women's car. The men were sitting in Morales's car when Deepak N. heard "a loud noise, like a gunshot." Morales had been looking in the rearview mirror. About 30 seconds after the noise, Morales got out of the car and quickly "fired some shots," and they left the scene thereafter. Morales drove fast, and, as he drove, checked to see how many rounds of ammunition he had left in his gun. Morales got rid of the gun somewhere in Vallejo.

About two weeks later, the police came to Deepak N.'s house. He jumped out of a second-story window and hid in his yard, but police found and arrested him. Deepak N. conceded that he lied and told

8

police that Morales had dropped him off before Morales and Luciano D. "did all that shit." Eventually, however, he told the truth.

## II.  DISCUSSION

We first address Morales's challenges to his conviction and then turn to his claims of sentencing error.

### A. *Prosecutorial Misconduct and Ineffective Assistance of Counsel*

#### 1.  Additional Background

The prosecutor made the following remarks at the end of his closing argument:

"Finally, ladies and gentlemen, before I wrap up, we watch you. We see you in the halls. We watch you coming in and stuff like that. And my sense is you get along just fine. [¶] But if somebody is not obeying the rules of the road, we got to know that.

"Here are the two ways sometimes this happens. Sometimes a juror makes an instant decision and her Honor's going to give you a closing instruction that says, Don't express strong opinions too quickly, because that's not usually productive in jury deliberations. [¶] But sometimes somebody just says: Nope, I'm refusing to deliberate, made up my mind. [¶] That's illegal. Can't do that. We got to know about that, if somebody decides that. Right? [¶] And the other one is if somebody just doesn't want to follow the law as it's stated, we got to know about that too.

"Her Honor made this point a dozen times in voir dire, maybe more, but it's that we are not legislators here. Our job is to follow the law. Right? [¶] The jury's job is to follow the law. If somebody is not doing that, somebody is refusing to deliberate or follow the law, you got

9

to send out a note and let us know.  I say that every time.  Almost never happens.  All right."

### 2.  Analysis

Morales argues that the prosecutor committed misconduct in his closing argument by:  1) stating that it was "illegal" for jurors to refuse to deliberate; 2) stating that jurors must report the failure to deliberate or follow the law after our Supreme Court discontinued use of a jury instruction with similar language in *People v. Engelman* (2002) 28 Cal.4th 436 (*Engelman*); and 3) conveying that jurors had no power to engage in nullification.  Respondent disputes that prosecutorial misconduct occurred and argues that Morales forfeited his claim by failing to object below.  We agree with respondent on the forfeiture point because Morales did not object to the alleged misconduct.  (*People v. Forrest* (2017) 7 Cal.App.5th 1074, 1081–1082.)

Morales alternatively argues that his counsel was ineffective for failing to object.  In order to establish ineffective assistance, Morales must show counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" i.e., a probability sufficient to undermine confidence in the outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*).)  A court deciding an ineffective assistance claim need not approach the inquiry in a certain order or even address both components of the inquiry if the defendant makes an insufficient showing on one component.  (*Id.* at p. 697.)

To establish that his trial counsel's performance fell below an objective standard of reasonableness, Morales must first show

prosecutorial misconduct. To do so, Morales relies largely on *Engelman.* In *Engelman*, our Supreme Court addressed the constitutionality of a jury instruction that "inform[ed] jurors at the outset of jury deliberations that 'should . . . any juror refuse[ ] to deliberate or express[ ] an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.' (CALJIC No. 17.41.1 (1998 new) (6th ed. 1996).)" (*Engelman*, *supra*, 28 Cal.4th at p. 439.) The Supreme Court held that giving the instruction did not violate the defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous verdict. (*Id.* at pp. 439–440.) Nevertheless, the court observed that the instruction had the potential to intrude into the deliberative process and was unnecessary because other instructions were adequate to guard against jury misconduct without focusing unduly upon the deliberative process. (*Id.* at pp. 446–449.) "[C]aution" thus led the court "to exercise its "supervisory power" to "direct that CALJIC No. 17.41.1 not be given in trials conducted in the future." (*Engelman,* at pp. 440, 449.) The Supreme Court has affirmed *Engelman* multiple times (*People v. Rogers* (2013) 57 Cal.4th 296, 340; *People v. Souza* (2012) 54 Cal.4th 90, 121; *People v. McKinnon* (2011) 52 Cal.4th 610, 681 (*McKinnon*)), and it has rejected assertions of constitutional error premised on comments from the court and prosecution urging jurors to bring juror misconduct, including refusal to deliberate, to the court's attention. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1055.)

11

Morales argues that the prosecutor's comments here went "further" than the instruction in *Engelman,* while respondent contends that the comments were proper. Although a prosecutor's remarks may have less potential for intrusion on the deliberative process than a formal instruction from the trial court (see *People v. Barnwell, supra,* 41 Cal.4th at p. 1055), we reject respondent's position and find the prosecutor's comments inappropriate in light of our Supreme Court's clear statement that telling a jury to report misconduct by fellow jurors is unnecessary and risks intruding into the deliberative process. (*Engleman, supra,* 28 Cal.4th at pp. 446–449.)

Nonetheless, because Morales's claim fails for lack of prejudice, we need not decide whether the prosecutor's comments rose to the level of misconduct (or, by extension, whether counsel's failure to object fell below an objective standard of reasonableness). Morales's theory of prejudice is that the prosecutor's comments could have had a chilling effect on minority views and could have prevented juror nullification. But after closing arguments, the court instructed the jurors that they had a duty to talk, deliberate, and follow the law; it further instructed that each juror must decide the case for himself or herself after discussing the evidence, and that no juror should change his or her mind just because other jurors disagree. Morales speculates that the prosecutor's comments would have greater influence than the jury instructions, but we presume the jury properly followed the instructions. (See *People v. Boyette* (2002) 29 Cal.4th 381, 436 [alleged prosecutorial misconduct not prejudicial when trial court properly instructed on the law because jury presumed to have followed instructions].) Morales points to no evidence of juror conflict, a refusal

12

to deliberate, or any explicit or implicit expressions of an intent to disregard the law.[2] (*McKinnon, supra,* 52 Cal.4th at p. 681 [upholding the use of CALJIC No. 17.41.1 in a pre-2002 trial and also finding no basis for reversal as defendant "points to nothing in the record of this case that indicates any juror refused to deliberate or expressed an intention to disregard the law or to decide the case on an improper basis"].)  And Morales cannot rely on the possibility of juror nullification to show prejudice.  (*Strickland, supra,* 466 U.S. at p. 695 [assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of "nullification"].)  In sum, Morales has not established prejudice from the prosecutor's remarks.

## B.  Alleged Error From the Kill Zone Instruction

After Morales's conviction, the Supreme Court clarified the circumstances that allow for a kill zone instruction on an attempted murder charge in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*). Morales challenges his attempted murder conviction, arguing that there was insufficient evidence to support a kill zone instruction and that the instruction given was erroneous after *Canizales*.

### 1.  The Kill Zone Theory of Attempted Murder

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'  [Citation.] When a single act is charged as an attempt on the lives of two or more

_____

[2] We note that no such indications occurred in this case.  The jury deliberated for approximately seven and a half hours over the course of two days, asking a single question about whether the "purpose" referred to in the lying-in-wait murder instruction specifically referred to the defendant's purpose to kill.  The jury then reached a verdict.

13

persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, *supra*, 7 Cal.5th at p. 602.)

The kill zone theory, first expressly embraced by Supreme Court in *People v. Bland* (2002) 28 Cal.4th 313, 329–330, provides a theory by which a defendant can be found guilty of the attempted murder of victims who were not the defendant's "primary target." "[A]lthough the intent to kill a primary target does not transfer to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone' " for attempted murder. (*Id.* at p. 329.) This theory is illustrated by the following hypothetical. "[C]onsider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death." (*Id.* at p. 330.)

In *Canizales*, the Supreme Court clarified the kill zone theory, holding "that a jury may convict a defendant under the kill zone theory

14

only when the jury finds that:  (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at pp. 596–597.)  "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target.  Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Id.* at p. 607.)

The Supreme Court further observed, "[a]s past cases reveal, there is a substantial potential that the kill zone theory may be improperly applied, for instance, where a defendant acts with the intent to kill a primary target but with only conscious disregard of the risk that others may be seriously injured or killed." (*Canizales*, *supra*, 7 Cal.5th at p. 597.)  "[T]rial courts must be extremely careful in determining when to permit the jury to rely upon the kill zone theory" (*ibid.*)*,* and "there will be relatively few cases in which the theory will be applicable and an instruction appropriate" (*id.* at p. 608).

In *Canizales*, five shots were fired at a man, who the jury could have concluded was a primary target, and the man's companion from 100 feet away at a block party on a public street. The shots were "going everywhere" and killed an innocent bystander rather than the primary target. (*Canizales*, *supra*, 7 Cal.5th at p. 611.) The court concluded, "The evidence presented here showed that from a substantial distance [the defendant] shot five bullets in the direction of a target who immediately ran down a city street after the first shot was fired. This evidence was insufficient to support instruction on the kill zone theory." (*Ibid.*)

## 2. The Attempted Murder Instruction Given

Morales was charged with attempted murder of "an occupant of a 1991 Blue Cadillac parked in front of 1707 17th Street in San Pablo." The jury instruction, which was based on CALCRIM No. 600, required the prosecution to prove: "1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." The trial court also instructed on a kill zone theory: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' [¶] In order to convict the defendant of the attempted murder of the occupants of a blue Cadillac parked in front of 1707 17th Street in San Pablo, CA, the People must prove that the defendant not only intended to kill the occupants of a blue Cadillac parked in front of 1707 17th Street in San Pablo, CA but also either intended to kill one of the occupants of a blue Cadillac parked in front of 1707 17th Street in San Pablo, CA, or intended to kill everyone within the kill zone. [¶] If you have a reasonable doubt whether the

16

defendant intended to kill occupants of a blue Cadillac parked in front of 1707 17th Street in San Pablo, CA or intended to kill occupants of a blue Cadillac parked in front of 1707 17th Street in San Pablo, CA by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of the occupants of a blue Cadillac parked in front of 1707 17th Street in San Pablo, CA."

### 3. Analysis

Morales first argues that the evidence was insufficient to support the kill zone instruction. The kill zone theory cannot be used unless (1) the defendant has a primary target, (2) the defendant harbors the intent to annihilate everyone within the kill zone in order to make sure he or she kills the primary target, and (3) the alleged victim of the attempted murder, "*who was not the primary target*," was inside the kill zone. (See *Canizales*, *supra*, 7 Cal.5th at pp. 597, 607, italics added.) Preliminarily, we note that this case was not tried as a kill zone case. The prosecutor alluded to the inside of the Cadillac when attempting to explain the kill zone instruction briefly in his closing argument, but he made no effort to identify nontargeted victims. Rather, he argued that Morales specifically intended to kill Gustavo D., Elias Q., and Deandre L., and that Morales also intended to kill whomever he could in the Cadillac, so he was responsible for attempted murder of Gustavo D. and Elias Q. The kill zone jury instruction here identified "the occupants" of the Cadillac as the primary targets. Only one count of attempted murder was charged, and, according to the prosecutor's theory, there was no nontargeted victim. In the absence of evidence of primary targets and a nontargeted victim of the attempted

17

murder charge, a kill zone theory would not apply. (*Canizales*, *supra*, 7 Cal.5th at p. 597.)

But even assuming the jury should not have been instructed on the kill zone theory because the evidence was insufficient to support a kill zone instruction, any error in giving the instruction was not prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).[3] (*Canizales*, *supra*, 7 Cal.5th at p. 614; *People v. Aledamat*, *supra*, 8 Cal.5th 1, 13.) Error is harmless if the record shows "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, at p. 24.) In other words, we must determine " 'whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.' " (*Canizales*, at p. 615.) Reversal is required if there is " 'a reasonable possibility' " that the error may have contributed to the verdict. (*Chapman*, at p. 24.)

Morales contends that the instruction was prejudicial because it equated the primary targets and the nontargeted victims, but the instruction's wording actually dispels a finding of prejudice. Under the kill zone instruction, the jury was told, "In order to convict the defendant of the attempted murder of the occupants of a blue Cadillac

---

[3] We agree with the parties that *Chapman*'s harmless error standard applies. As in *Canizales*, the jury was instructed adequately on a specific intent to kill theory, but the kill zone instruction here was similar to the instruction deemed inadequate in *Canizales* (see *Canizales*, *supra*, 7 Cal.5th at p. 613), and, as discussed, *post*, the prosecutor did not accurately explain a kill zone theory. Therefore, as in *Canizales*, "there is a ' "reasonable likelihood" ' that the jury understood the kill zone theory in a legally impermissible manner." (*Ibid*.) When the jury is instructed on a legally inadequate theory, *Chapman* applies. (*People v. Aledamat* (2019) 8 Cal.5th 1, 13.)

18

parked in front of 1707 17th Street in San Pablo, CA, the People must prove that the defendant not only *intended to kill the occupants of a blue Cadillac parked in front of 1707 17th Street in San Pablo, CA* but also either intended to kill one of the occupants of a blue Cadillac parked in front of 1707 17th Street in San Pablo, CA, or intended to kill everyone within the kill zone." (Italics added.) While awkwardly worded, the instruction could not have prejudiced Morales because a conviction thereunder expressly required the jury to find that Morales intended to kill all occupants of the Cadillac. In *People v. Tran* (2018) 20 Cal.App.5th 561 (*Tran*), where a kill zone instruction erroneously listed the same person as the primary target and the nontargeted victim, the court rejected a similar assertion of prejudice.[4] While the instruction "could very well have prejudiced the prosecution, insofar as it effectively deprived it of the opportunity to obtain a conviction for attempted murder based on the theory of concurrent intent . . . it could not possibly have prejudiced [the defendant] because it expressly required the jury to find he harbored the intent to kill [the person alleged to be the primary target and victim] in order to convict him of that offense." (*Id*. at p. 565, italics removed.)

---

[4] The instruction in *Tran* stated, "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone. [¶] In order to convict the defendant of the attempted murder of Roger James, the People must prove that the defendant not only intended to kill Roger James but also either intended to kill Roger James or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Roger James or intended to kill Roger James by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Roger James." (*Tran*, *supra*, 20 Cal.App.5th at pp. 565.)

19

Further, in his brief comment in closing argument on the kill zone instruction, the prosecutor did not actually articulate a kill zone theory. He said, "Man, when the lawyers who set out to write this stuff threw down their gauntlets, they made it stick on kill zone. It's a little bit hard to follow what's in the CALCRIM instruction for kill zone. But essentially it means this. If the defendant aimed down the street at that Cadillac, which he did, and was hoping to kill whomever he can kill in the Cadillac—Gustavo, Elias, hoping to kill Deandre. Deandre wasn't out of the house yet. But he was still hoping to kill those people—and his goal was to kill whomever he could kill, he's responsible for attempted murder against Gustavo and Elias. [¶] His intent to kill whomever he can kill in the Cadillac makes him guilty for trying to kill them." Aside from this comment, counsel said nothing about the kill zone theory. Instead, he argued that this was an express malice attempted murder case wherein Morales shot with the intent to kill Gustavo D., Elias Q., and Deandre L. Given the prosecutor's argument and the fact that the kill zone instruction explicitly required the jury to find that Morales "intended to kill the occupants of [the] Cadillac," any error here was harmless under *Chapman*.

## C. The Section 12022.53(d) Firearm Use Enhancement for Count 1

### 1. Additional Background

For count 1, the murder of Ilaysia M., the information alleged that Morales personally and intentionally discharged a firearm causing great bodily injury and death to Ilaysia M. "within the meaning of [the firearm enhancement set forth in] section 12022.53(d)."

20

The trial court gave a modified version of CALCRIM No. 3149, the jury instruction applicable to a section 12022.53(d) enhancement, as follows: "If you find the defendant guilty of the crimes charged in Counts 1 through 4, or of attempting to commit those crimes, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally and intentionally discharged a firearm during that crime causing great bodily injury or death. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime." "To prove this allegation, the People must prove that: [¶] 1. The defendant personally discharged a firearm during the commission or attempted commission of that crime; [¶] 2. The defendant intended to discharge the firearm; AND [¶] 3. *The defendant's act caused great bodily injury to or the death of a person or fetus*." (Italics added.) Thus, the foregoing italicized third element omitted the phrase "who was not an accomplice to the crime."[5] (CALCRIM. No. 3149.)

In connection with count 1, the jury found true that Morales "personally and intentionally discharged a firearm, a handgun, which caused great bodily injury and death to llaysia [M.]" within the

---

[5] The unmodified version of CALCRIM No. 3149 also includes a bracketed definition of "accomplice": "[A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. A person is subject to prosecution if he or she committed the crime or if: [¶] 1. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 2. He or she intended to, and did in fact, (aid, facilitate, promote, encourage, or instigate the commission of the crime/ [or] participate in a criminal conspiracy to commit the crime).]

21

meaning of section 12022.53(d).  As a result, the court imposed but stayed a consecutive term of 25 years to life.

## 2. Analysis

Section 12022.53(d) authorizes a term enhancement of 25 years to life when the defendant, "in the commission of a felony specified in subdivision (a) . . . personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice."  Morales argues that Ilaysia M. was an accomplice (as an aider and abettor and/or coconspirator) to the crime of disturbing the peace (§ 415, subd. (1)[6]), and the court denied him due process of law by modifying CALCRIM No. 3149 to eliminate the need for the jury to determine whether Ilaysia M. was a "person other than an accomplice" (§ 12022.53(d)).   We review Morales's claim of instructional error de novo.  (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 751.)

Following *People v. Flores* (2005) 129 Cal.App.4th 174 (*Flores*), on which Morales relies, we agree that the court erred when it omitted the accomplice language from the jury instruction on the section 12022.53(d) enhancement for count 1.  *Flores* addressed the question of whether the jury should have been instructed on section 12022.53(d)'s accomplice language when the enhancement attached to a charge of murder of a man (Valdivia) committed during a battery on a rival gang member (Morales) that Valdivia conspired with the defendant to commit.  (*Id.* at p. 182.)  While Valdivia engaged in a fistfight with

---

[6] Under subdivision (1) of section 415, it is illegal to "unlawfully fight[ ] in a public place or challenge[ ] another person in a public place to fight."

Morales, the defendant shot at Morales but hit and killed Valdivia. (*Id.* at pp. 178–179.) As here, the trial court failed to include the words "other than an accomplice" in its jury instruction on this enhancement. (*Id.* at pp. 178, 180–181.) The Attorney General conceded instructional error on appeal, but argued the error was harmless because an "accomplice" means one "chargeable with the same offense as the defendant who is being tried" (see § 1111), and "one cannot be charged as an accomplice to one's own murder." (*Flores*, *supra*, 129 Cal.App.4th at p. 182.)

The appellate court rejected the Attorney General's argument, noting that if it were to accept the argument, section 12022.53(d)'s accomplice exception would never apply to a count charging the accomplice's murder. (*Id.* at p. 182.) The court reasoned that the Legislature could not have intended this result because, in enacting section 12022.53(d), the Legislature "apparently decided that killing one's accomplice is less blameworthy (or at least less deserving of punishment) than killing a nonaccomplice." (*Id.* at p. 181.) The court commented that, "[h]ad [Flores's] shot hit only Morales or Morales and some other person" (*ibid.*)—in other words, had Valdivia survived— Valdivia "would surely have been charged as a coconspirator and an aider and abettor of defendant's crimes, i.e., an accomplice." (*Ibid.*) Thus, to address the inconsistency that would otherwise result, *Flores* found that "when determining whether the accomplice exception applies to [the murder of Valdivia] in the instant case, and to avoid writing the exception out of the statute, the relevant question must be whether Valdivia was an accomplice to the intended crime, the natural and probable consequence of which was the intentional discharge of a

23

firearm resulting in his own death." (*Ibid.*) The court concluded that a jury could have found Valdivia was the defendant's coconspirator. (*Ibid.*) "Valdivia's status as a coconspirator to commit a battery on Morales would make him defendant's accomplice to that crime, which resulted in his own murder." (*Id.* at p. 183.) Thus, the court found prejudicial error resulted from the flawed jury instruction. (*Ibid.*)

Under *Flores*, the accomplice exception could have applied to count 1's section 12022.53(d) enhancement. Section 415 makes it a crime to unlawfully fight in a public place or challenge another person in a public place to fight (§ 415, subd. (1)), and there was sufficient evidence for the jury to find that Morales (who was armed), Ilaysia M., and Ilaysia M.'s friends conspired to violate section 415, which resulted in Ilaysia M.'s death. (*Flores*, *supra*, 129 Cal.App.4th at p. 183; see *People v. Vu* (2006) 143 Cal.App.4th 1009, 1024 [criminal conspiracy requires proof of: an agreement between two or more people; who have the specific intent to agree or conspire to commit an offense; the specific intent to commit that offense; and an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the conspiracy's object].)

Respondent does not argue that *Flores* was wrongly decided, and instead attempts to distinguish this case by characterizing the intended crime to be murder of the Cadillac's occupants. We find this argument unavailing because respondent does not acknowledge that the evidence is sufficient for a reasonable juror to conclude that Morales and Ilaysia M. conspired to violate section 415, and *Flores* involved an analogous set of circumstances where the defendant shot at Morales during a battery that he and Valdivia conspired to commit. (*Flores, supra,*

24

129 Cal.App.4th at pp. 182–183 [noting sufficient evidence from which a jury could have found that Flores and Valdivia conspired to commit a battery upon Morales, the natural and probable consequences of which was the firearm discharge that killed co-conspirator Valdivia].) We further reject respondent's attempt to distinguish *Flores* on the basis that the defendant there was convicted of conspiracy to commit battery. The prosecution's election not to charge Morales with a conspiracy to violate section 415 in addition to the serious crimes charged is not dispositive of the inquiry as to whether Ilaysia M. could have been an accomplice to the crime she and Morales intended to commit—section 415—the natural and probable consequence of which, in these circumstances, was the intentional discharge of a firearm resulting in her death. Under *Flores,* this is the inquiry that is relevant and required to avoid reading the accomplice exception out of section 12022.53(d) where the crime charged is murder and an alleged accomplice is the murder victim. (*Flores,* at pp. 182–183.)

The failure to permit the jury to determine if Ilaysia M. was an accomplice for purposes of the section 12022.53(d) enhancement on count 1 is not harmless under *Chapman*, *supra*, 386 U.S. 18, or *People v. Watson* (1956) 46 Cal.2d 818. (*Flores*, *supra*, 129 Cal.App.4th at p. 183.) We thus strike the section 12022.53(d) enhancement on count 1. (*Flores*, at pp. 178, 183, 188.)[7] In striking this enhancement on

_____

[7] Morales incorrectly states that the remedy for the error in *Flores* was to reduce the section 12022.53(d) enhancement to one without an accomplice exception, such as section 12022.53, subdivision (c). In fact, the *Flores* court struck the section 12022.53(d) enhancement. (*Flores*, *supra*, 129 Cal.App.4th at pp. 178, 183, 188.) Respondent does not contend that a section 12022.53, subdivision (c) enhancement should be imposed if we find reversible error.

25

appeal, we observe that the trial court showed leniency to Morales by staying the sentences on all the firearm-use enhancements. In light of this purposeful show of leniency, it is unlikely that the trial court would impose a firearm use enhancement on count 1 if the matter were remanded, retried, and a properly instructed jury found the enhancement true. (§ 12022.53, subd. (h) [trial court has discretion to strike or dismiss an enhancement found true].) Therefore, in the interest of judicial economy, we do not remand the matter for retrial on the firearm use enhancement for count 1.

### D. Sentencing Error on Counts 1 and 2

Defendant was charged with two counts of murder with a multiple murder special circumstance allegation. The jury found the special circumstance allegation true. The court imposed an LWOP sentence for the special circumstance, and two consecutive terms of 25 years to life for counts 1 and 2.[8] We agree with the parties that this sentence was unauthorized under section 190.2, subdivision (a)(3).

Section 190.2, subdivision (a)(3) provides for a sentence of death or LWOP in a case in which the defendant has been convicted of first degree murder and more than one offense of murder in the first or second degree in the same proceeding. No matter how many murder charges are tried together, only a single multiple murder special circumstance may be alleged. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1150, superseded by statute on another point as recognized in *People v. Letner and Toben* (2010) 50 Cal.4th 99, 163, fn. 20.) However, the special circumstance applies to each murder count for which the

---

[8] The trial court intended the terms to run consecutively, noting there were different victims.

defendant was convicted, and where, as here, the prosecution does not seek the death penalty, the LWOP sentence is applied to each count. (*People v. Garnica* (1994) 29 Cal.App.4th 1558, 1563–1564.) There is no statutory authority to impose an LWOP term for the special circumstance itself, as the trial court did in this case. Therefore, we will direct that the abstract of judgment be corrected to reflect a sentence of LWOP for the murder counts but not the special circumstance finding itself, and to eliminate the terms of 25 years to life on the murder counts.[9]

### E. Remand Is Unnecessary under Section 12022.53(h)

Senate Bill No. 620, effective January 1, 2018, added the following language to section 12022.53: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h); Stats. 2017, ch. 682, § 2.) This new legislation granted trial courts discretion to strike firearm use enhancements that they did not previously possess. Morales contends that this case must be remanded because the trial court did not understand that it had the discretion to strike the firearm use enactments under this provision. We disagree.

---

[9] Morales does not argue that we cannot correct the unauthorized sentence on appeal. He instead asserts that remand is necessary so that the trial court can exercise its sentencing discretion under section 12022.53, subdivision (h), and so that he may have an adequate opportunity to make a record of information that will be relevant at youthful offender parole hearing. As explained, *post*, Morales is not entitled to remand on the grounds he claims, so we will order correction of the unauthorized sentences.

27

Contrary to Morales's claim, nothing in the record suggests that the trial court was unaware of its discretion under section 12022.53, subdivision (h). "[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) Remand for resentencing is only appropriate where the record affirmatively demonstrates the trial court misunderstood the scope of its discretion. (*People v. Sotomayor* (1996) 47 Cal.App.4th 382, 391; *People v. Furhman* (1997) 16 Cal.4th 930, 944.) The trial court sentenced Morales one year and five months after Senate Bill No. 620 became effective. Morales is correct that the materials and argument at his sentencing hearing did not touch upon the court's discretion under section 12022.53, subdivision (h), but that merely shows a silent record. Although the trial court stated that it lacked discretion regarding Morales's LWOP sentence in light of the special circumstance finding, the court did not comment on its discretion to strike the firearm use enhancements, and the court showed leniency by staying the sentences for the firearm use enhancements. In the absence of any affirmative representation by the trial court that it believed it could not dismiss the firearm use enhancements, we presume the court understood the scope of its discretion and did not commit error.[10]

---

[10] The parties do not argue that the court erred in staying the sentences on the firearm use enhancements.

28

## F. Equal Protection

Morales raises equal protection challenges to statutes that allow: (1) juvenile LWOP offenders to petition for recall and resentencing after a certain period of incarceration (§ 1170, subd. (d)(2) (section 1170(d)(2)); (2) the trial court to exercise discretion to sentence juveniles over the age of 16 but under the age of 18 who are convicted of first degree murder with special circumstances to LWOP or 25 years to life (§ 190.5, subd. (b) (section 190.5(b)); and (3) juvenile LWOP and young adult non-LWOP offenders to be considered for youthful parole hearings (§ 3051, subds. (b)(1)–(4), (h)). Because Morales's offenses occurred when he was 21, he will not benefit from these statutes. The facial challenges that he raises to his exclusion may be raised for the first time on appeal. (*People v. Edwards* (2019) 34 Cal.App.5th 183, 192 (*Edwards*).)

### 1. Governing Constitutional Principles

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws." (*Edwards*, *supra*, 34 Cal.App.5th at p. 195.) "The right to equal protection of the law is violated when 'the government . . . treat[s] a [similarly situated] group of people unequally without some justification.' " (*People v. Love* (2020) 55 Cal.App.5th 273, 287.)

The principles by which we evaluate a claimed equal protection violation are well established. Where there are no suspect classes or fundamental rights at issue, we apply rational basis review. (*People v. Chatman* (2018) 4 Cal.5th 277, 288–289 (*Chatman*).) Rational basis review "sets a high bar before a law is deemed to lack even the minimal

29

rationality necessary for it to survive constitutional scrutiny. Coupled with a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair." (*Id.* at p. 289.)

"In order to decide whether a statutory distinction is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection, we typically ask two questions. We first ask whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner. [Citation.] If we deem the groups at issue similarly situated in all material respects, we consider whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose. [Citation.] A classification in a statute is presumed rational until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable. [Citation.] . . . [Citation.] Nor does the logic behind a potential justification need to be persuasive or sensible—rather than simply rational." (*Id.* at p. 289.) "A law will be upheld as long as a court can 'speculat[e]' any rational reason for the resulting differential treatment, regardless of whether the 'speculation has "a foundation in the record," ' regardless of whether it can be 'empirically substantiated,' and regardless of whether the Legislature ever 'articulated' that reason when enacting the law." (*People v. Love, supra,* 55 Cal.App.5th at p. 287, quoting *People v. Turnage* (2012) 55 Cal.4th 62, 74.) As a result, "[t]o mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed

statutory disparity." (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.)

## 2. Sections 1170(d)(2) and 190.5(b)

Morales contends that section 1170(d)(2)[11], which allows juvenile LWOP offenders to petition for recall and resentencing after 15 years of incarceration, violates his constitutional rights to equal protection of the law because it does not apply to youthful adult LWOP offenders like him, who were between the ages of 18 and 25 when they committed their crimes. He makes a similar argument regarding section 190.5(b)[12]. A different panel of this Division rejected an identical equal protection challenge to section 1170(d)(2) in *In re Jones* (2019) 42 Cal.App.5th 477 (*Jones*), and we find *Jones*'s reasoning to be persuasive and applicable to Morales's challenges to sections 1170(d)(2) and 190.5(b).

In *Jones*, the defendant was an LWOP offender who committed his crimes when he was 19, and he claimed his inability to petition for

---

[11] This statute provides, subject to certain exceptions, that "[w]hen a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing." (§ 1170, subd. (d)(2)(A)(i).)

[12] This subdivision provides, "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b).)

31

resentencing under section 1170(d)(2) violated his right to equal protection. (*Jones*, *supra*, 42 Cal.App.5th at p. 480.) He argued that the " 'underlying rationale' " of section 1170(d)(2) is that " 'young people are different developmentally and neurologically' from older offenders," and "young adults who are between 18 and 25 when they commit their LWOP offenses are similarly situated to juvenile LWOP offenders because they also have developing brains, lack maturity, and have increased potential for rehabilitation." (*Id*. at p. 481.) The court observed that, while the Legislature may well have been concerned about the developmental differences between youth and adults, the statute was more specifically aimed at providing relief only for those under 18 when they committed their crimes. (*Ibid*.) *Jones* held that, "[b]ecause LWOP offenders who were between the ages of 18 and 25 when they committed their offenses are adult offenders they are not similarly situated to juvenile offenders described in section 1170(d)(2)." (*Id*. at p. 481.) *Jones* further held that the Legislature had a rational basis for section 1170(d)(2)'s distinction between juvenile and adult LWOP offenders. "Drawing a bright line at age 18 establishes an objective and easily implemented measure, which has been used by the United States Supreme Court for sentencing purposes. While a different line could have been drawn, it is not entirely arbitrary to limit section 1170(d)(2) to individuals who committed their crimes before they were 18 years old." (*Id*. at p. 483.) We see no reason to disagree with *Jones*, and its rationale applies as well to section 190.5(b). We thus reject Morales's equal protection challenges to these statutes.

### 3. Section 3051

Under section 3051, a person convicted of a controlling offense[13] committed as a juvenile and sentenced to LWOP shall be eligible for a youthful offender parole hearing, but a person sentenced to LWOP for a controlling offense committed after the person turned 18 is not entitled to such a hearing. (§ 3051, subds. (b)(4), (h).) Additionally, a person convicted of a controlling offense committed between the ages of 18 to 25 (hereinafter, a youthful offender) who received a determinate sentence, an indeterminate sentence of 25 years to life, or an indeterminate life term of less than 25 years is eligible to petition for a youthful offender parole hearing, but a youthful LWOP offender is not. (§ 3051, subds. (b)(1)–(3), (h).) Morales asserts that section 3051 violates his right to equal protection because it denies parole hearings to youthful LWOP offenders, but grants such hearings to juvenile LWOP offenders and youthful non-LWOP offenders. We review these claims de novo (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208; *People v. Ramos* (1997) 15 Cal.4th 1133, 1154), and we conclude they lack merit.

#### a. The Statute's History and Purpose

The Legislature enacted section 3051 in response to decisions from the United States and California Supreme Courts concerning

---

[13] " 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

33

Eighth Amendment limitations on juvenile sentencing[14] that, in turn, rested on developments in science and social science showing fundamental differences between juvenile and adult minds and parts of the brain involved in behavior control. (*People v. Acosta* (2021) 60 Cal.App.5th 769, 775–776 (*Acosta*).) "The Legislature passed [section 3051] explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*." (*People v. Franklin* (2016) 63 Cal.4th 261, 277.) In enacting section 3051, the Legislature explained that "youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society." (Stats. 2013, ch. 312, § 1.) Section 3051's stated purpose was "to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court . . . and the decisions of the United States Supreme Court." (Stats. 2013, ch. 312, § 1.) Courts have recognized that the statute's "legislative history suggests the Legislature was motivated by dual concerns: that lengthy life sentences did not adequately account for, first, the diminished culpability of youth, and second, youthful

---

[14] *Graham v. Florida* (2010) 560 U.S. 48, 68 (*Graham*) [Eighth Amendment prohibits imposing LWOP sentence on juvenile offender for nonhomicide offenses]; *Miller v. Alabama* (2012) 567 U.S. 460, 465 (*Miller*) [mandatory LWOP sentences for juvenile homicide offenders violate the Eighth Amendment]; *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*) [juvenile cannot be sentenced to functional equivalent of LWOP for a nonhomicide offense].)

offenders' greater potential for rehabilitation and maturation." (*In re Williams* (2020) 57 Cal.App.5th 427, 434.)

As originally enacted, section 3051 afforded parole eligibility hearings only to juvenile offenders, and it excluded juvenile LWOP offenders. (*Acosta*, *supra*, 60 Cal.App.5th at pp. 776.) Relying on scientific evidence showing that areas of the brain that affect judgment and decision-making do not develop until early-to mid-20s, the Legislature has since amended section 3051, first to apply to offenders 23 and under (former § 3051, subd. (a)(1), added by Stats. 2015, ch. 471, § 1), then to offenders 25 and under (§ 3051, subd. (b); Stats. 2017, ch. 675, § 1).

The Legislature also amended section 3051 to allow parole hearings for juveniles—but not youthful offenders—sentenced to LWOP. (§ 3051, subd. (b)(4); Stats. 2017, ch. 684, § 1.) The purpose of this amendment was to "bring California into compliance with the constitutional requirements of [*Miller*] and *Montgomery [v. Louisiana* (2016) 577 U.S. ___, 136 S.Ct. 718]," which held that *Miller's* prohibition on mandatory LWOP sentences for juveniles was retroactive. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017–2018 Reg. Sess.) Mar. 21, 2017, p. 4.) *Montgomery* provided that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." (*Montgomery*, at p. 212.) Thus, the amendment adding section 3051, subdivision (b)(4) sought "to remedy the now unconstitutional juvenile sentences of life without the possibility of parole," without the need for "a resentencing hearing, which is time-consuming, expensive, and subject to extended appeals." (Sen. Com. on

Public Safety, Analysis of Sen. Bill No. 394 (2017–2018 Reg. Sess.) Mar. 21, 2017, p. 3.)

### b. Analysis

With this background in mind, we turn first to Morales's claim that section 3051 violates equal protection by treating juvenile and youthful LWOP offenders differently. Even assuming these groups are similarly situated, Morales's claim fails because he has not demonstrated that the Legislature lacked a rational basis for treating these groups in an unequal manner. As noted, the Legislature enacted subdivision (b)(4) of section 3051 to remedy unconstitutional juvenile LWOP sentences after *Miller* and *Montgomery*. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017–2018 Reg. Sess.) Mar. 21, 2017, p. 3.) But in contrast to the decisions in *Miller* and *Montgomery,* the United States and California Supreme Courts have not held that LWOP sentences for youthful offenders violate the Eighth Amendment. When it comes to criminal sentencing, the United States Supreme Court has found the line drawn between juveniles and nonjuveniles to be a rational one (*Jones, supra,* 42 Cal.App.5th at pp. 482–483), and section 3051 impacts the length of sentence served. (*People v. Franklin*, *supra*, 63 Cal.4th at pp. 277–280 [section 3051 "superseded" defendant's sentence, capping the number of years a prisoner may be imprisoned before becoming eligible for parole, and thereby mooted the defendant's Eighth Amendment challenge after *Miller*].) In this context, we agree with our colleagues in the Fourth District that, for purposes of LWOP offenders, the line drawn at 18 is a rational one. (*Acosta*, *supra*, 60 Cal.App.5th at pp. 779–780 [age provides a rational basis for section 3051's different treatment of youthful and juvenile

LWOP offenders]; *People v. Jackson* (2021) 61 Cal.App.5th 189, 199 [same] (*Jackson*); cf. *Jones, supra,* 42 Cal.App.5th at p. 482 ["While young adults share many of the attributes of youth, they are by definition further along in the process of maturation, and the law need not be blind to the difference."].)

Relying on *Edwards*, *supra*, 34 Cal.App.5th 183, Morales next argues that, because youthful LWOP offenders convicted of murder with a multiple-murder special circumstance finding may have committed murder by lying in wait, whereas a youthful non-LWOP offender may have committed the allegedly more culpable crime of premeditated murder, there can be no rational basis for section 3051's differing treatment of youthful LWOP and youthful non-LWOP offenders. Assuming that these groups of offenders are similarly situated for purposes of section 3051, we disagree with Morales.

In *Edwards*, another panel of this Division held that section 3051 violated equal protection because a sentencing scheme cannot limit the parole opportunity of persons sentenced under section 667.61, the "One Strike" law, more harshly than it limits the parole opportunity of those who commit intentional first degree murder. (*Edwards*, *supra*, 34 Cal.App.5th at p. 195.) *Edwards* found "no rational relationship between the disparity of treatment [of one-strike offenders and first-degree murderers] and a legitimate governmental purpose." (*Id.* at p. 197.) *Edwards* reached its conclusion because murder was a more serious offense, yet murderers were afforded a youthful parole hearing. (*Id.* at pp. 192, 194–197, 199.) *Edwards* reasoned, "[W]e cannot ignore United States Supreme Court teaching that no crime deserves categorically harsher punishment than intentional first degree

37

murder." (*Id.* at p. 199; see *Edwards,* at p. 197 ["United States Supreme Court case law has long distinguished between such murders and other crimes against persons, reserving the most draconian sentences for murderers alone"].)[15]

In comparing first degree murder convictions and murder convictions with a multiple murder special circumstance, such as his, Morales ignores that the latter type of conviction requires the defendant to have been convicted of one first degree murder and an additional first or second degree murder in the same proceeding. (§ 190.2, subd. (a)(3).) "The crime [of special circumstances multiple murder] carries a mandatory sentence of LWOP or death (§ 190.2, subd. (a)), which are the harshest penalties available under our penal system and are reserved for crimes of the most heinous nature." (*In re Williams*, *supra*, 57 Cal.App.5th at p. 436.) Unlike in *Edwards*, then, the severity of the crime and the offender's culpability provide a rational basis for the differing treatment. As explained in *Acosta,* there is "a rational basis for distinguishing between a young adult LWOP offender and a young adult offender serving a non-LWOP sentence: the severity of the crime committed. 'The Legislature has prescribed an LWOP sentence for only a small number of crimes. These are the crimes the Legislature deems so morally depraved and so injurious as to warrant a sentence that carries no hope of release for the criminal

---

[15] *People v. Williams* (2020) 47 Cal.App.5th 475, review granted July 22, 2020, S262191, disagreed with *Edwards*, and our Supreme Court will now decide the question of whether section 3051, subdivision (h) violates equal protection by excluding youthful one-strike offenders from youthful offender parole consideration, while affording youthful offenders convicted of first degree murder such consideration.

and no threat of recidivism for society. In excluding LWOP inmates from youth offender parole hearings, the Legislature reasonably could have decided that youthful offenders who have committed such crimes—even with diminished culpability and increased potential for rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration.' " (*Acosta, supra*, 60 Cal.App.5th at p. 780; *Jackson, supra*, 61 Cal.App.5th at pp. 199–200 [even assuming all murderers are similarly situated with respect to section 3051's desire to allow youthful offenders the chance to show they have reformed, "the difference in the underlying crimes, and the fact that special circumstance murder is punished more harshly, provide a rational reason for distinguishing between the two groups of first degree murderers."].) Section 3051's parole eligibility dates, which tier off the offender's sentence for his or her controlling offense, also demonstrate that the Legislature was cognizant of and considered the severity of the offense and culpability associated therewith, even within the groups of eligible offenders. (See § 3051, subd. (b)(1)–(4).)

In sum, given the deferential standard applicable to this equal protection challenge, and given that LWOP sentences for youthful offenders have not been declared to violate the Eighth Amendment, we conclude that there is a rational basis for the Legislature's decision to treat youthful offenders sentenced to LWOP differently than youthful first degree murderers not sentenced to LWOP based on public safety concerns and the desire to punish those who commit special circumstance multiple murder more harshly than those who commit

first degree murder without such aggravating circumstances. (*Jackson, supra,* 61 Cal.App.5th at p. 200.)

In reaching this conclusion, we acknowledge that the United States and California Supreme Courts have recognized that certain traits lessen a juvenile offender's culpability, and that such traits and a juvenile's capacity for reform are not "crime-specific." (*Miller, supra,* 567 U.S. at p. 473; *Caballero, supra,* 55 Cal.4th at pp. 267–268.) It is, after all, possible that a youthful offender sentenced to LWOP would mature and prove suitable for release at some point during his or her incarceration, just as would a juvenile sentenced to LWOP. We therefore share the reservations expressed by the *Acosta* court, and join others in urging the Legislature to reconsider the exclusion of youthful LWOP offenders from the opportunity provided by section 3051. (*Acosta, supra,* 60 Cal.App.5th at p. 781; *Jones, supra,* 42 Cal.App.5th at pp. 486–487 (conc. opn. of Pollak, J.); *People v. Montelongo,* (2021) 55 Cal.App.5th 1016, 1041 (conc. opn. of Segal, J.), review denied Jan. 27, 2021, S265597; see *Montelongo*, at p. 1041 *(*conc. stmt. of Liu, J., denying review).) In so doing, however, we must also acknowledge that "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." (*People v. Turnage* (2012) 55 Cal.4th 62, 74.)

## III.   DISPOSITION

The judgment is modified by striking the sentences of 25 years to life on counts 1 and 2, and the term of life without the possibility of parole imposed for the multiple-murder special circumstance finding. The superior court is ordered to impose instead a term of life without the possibility of parole on counts 1 and 2. For count 1, the jury's true

finding under section 12022.53(d) is reversed, and the 25-years-to-life enhancement imposed upon that finding is vacated.  In all other respects, the judgment is affirmed.  The clerk of the superior court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

BROWN, J.

I CONCUR:

TUCHER, J.

*People v. Morales*  (A157644)

POLLAK, P.J., Concurring and Dissenting.

I concur in the analysis and conclusions in the majority opinion with respect to all issues except the constitutionality of excluding youthful offenders (those between 18 and 25 years of age) sentenced to life imprisonment without the possibility of parole (LWOP) from eligibility for eventual parole consideration pursuant to the provisions of Penal Code section 3051.[1]

I acknowledge that the majority's conclusion on this issue is in accord with the decisions of other courts that have considered the issue (*People v. Jackson* (2021) 61 Cal.App.5th 189 (*Jackson*); *People v. Acosta* (2021) 60 Cal.App.5th 769 (*Acosta*); *In re Williams* (2020) 57 Cal.App.5th 427, disagreed with in part by *People v. Miranda* (2021) 62 Cal.App.5th 162; cf. *People v. Wilkes* (2020) 46 Cal.App.5th 1159 [exclusion of Three Strike offenders from scope of section 3051 does not violate equal protection]). Yet I note that many of those opinions, like the majority here, encourage the Legislature to consider repealing the exclusion. And see the concurring statement of Justice Liu in *Jackson*: "at least 11 justices of the Court of Appeal [now 13] have called for legislative reconsideration of section 3051. [Citations.] I again echo my colleagues in 'invit[ing] the Legislature to reconsider whether our evolving knowledge of brain development suggests that unalterable judgments about individuals based on what they did between age 18 and 25 may be unjustifiable.' " (61 Cal.App.5th at p. __ [2021 Cal.App.Lexis 152 at p. **22] (conc. stmt. of Liu, J.).) While I again join in urging the Legislature to reconsider the matter, I respectfully

_____

[1] All statutory references are to the Penal Code.

1

contend that the exclusion is fundamentally irrational and denies youthful offenders sentenced to LWOP equal protection of the law.

The principles governing equal protection analysis are correctly stated in the majority opinion and need not be repeated at length. In short, it must be determined whether the disfavored party is similarly situated with those treated more favorably by the statue in question and, if so, whether there is a rational basis for the difference in treatment.

I do not question that the difference between the treatment of minors convicted of LWOP offenses and youthful offenders sentenced to LWOP does not violate equal protection principles. The justification for treating minors more favorably than adults is so well rooted in our law that I do not question it. However, in my view, equal protection principles do not justify denying parole consideration under section 3051 to youthful offenders sentenced to LWOP while affording youthful offenders sentenced to life imprisonment with the possibility of parole the right to consideration under that statute.

The two groups of offenders are similarly situated for the purpose of considering their treatment under section 3051 in that both have been sentenced to life imprisonment. Both groups committed their life crimes during the stage of their lives that has been recognized to precede full neurological development of behavioral controls. Some courts considering this issue have agreed or assumed that this similarity satisfies the first prong of equal protection analysis. (*Acosta, supra,* 60 Cal.App.5th at pp. 778–779.)[2] As to those that claim the

---

[2] The majority opinion in *Williams* agreed that "youth offenders sentenced to LWOP and those sentenced to a parole-eligible life terms

groups are dissimilar because their sentences are different (see *Jackson, supra,* 61 Cal.App.5th at p. 199), I agree with Justice Dato's reasoning in his concurrence in *Jackson,* rejecting the significance of this distinction*:* "where a facial classification is challenged there will always be differences between two groups, and to state that the relevant groups are not 'similarly situated' is in many respects announcing the conclusion before performing the analysis. As the Supreme Court has explained, rejecting a constitutional challenge at the outset by finding that two groups are not 'similarly situated' would have the effect of 'insulat[ing] the challenged . . . statute[] from *any* meaningful equal protection review.' " (*Id.* at p. 201 (conc. opn. of Dato, J.).) The majority here does not disagree that the two groups of youthful offenders sentenced to life imprisonment are similarly situated for this purpose. The question is whether there is a rational basis for including one and excluding the other from the re-evaluation afforded by section 3051.

In determining whether there is a rational basis for the distinction drawn by section 3051, the purpose of the statute is critical. Section 3051 is not a sentencing statute. Although whether the section

---

are similarly situated with respect to the Legislature's second goal— i.e., to account for youthful offenders' potential for growth and rehabilitation. Applying the legislative findings, one could say that both groups committed their crimes before their prefrontal cortexes reached their full functional capacity, when their characters were not yet fully formed. Both groups are equally likely to demonstrate improved judgment and decision-making as they reach emotional and cognitive maturity." (*In re Williams, supra,* 57 Cal.App.5th at p. 435.) However, the court felt they were not "similarly situated with respect to the Legislature's first goal, which is to calibrate sentences in accordance with youthful offenders' diminished culpability." (*Ibid.*)

applies may of course affect the length of a person's imprisonment, section 3051 is not designed to determine the sentence that is appropriate for the crime the particular person has committed. Other provisions, including sections 190 and 190.2, are designed to do that. In contrast, section 3051 is intended to permit evaluation of whether, over an extended period of incarceration, an individual who committed a serious crime while still youthful has been rehabilitated and can be released from custody without risk to the public.

As recited at length in prior opinions (*Acosta, supra,* 60 Cal.App.5th at pp. 776–777; *Jackson, supra,* 61 Cal.App.5th at p. 194; *In re Williams, supra,* 57 Cal.App.5th at pp. 431–432; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, __ [2020 Cal.App. Lexis 956, p. *40] (conc. stmt. of Liu, J.); In re Jones (2019) 42 Cal.App.5th 477, 486–487 (conc. opn. of Pollak, J.)), and acknowledged in the majority opinion here (*ante*, pp. 34–35), the Legislature has recognized the body of scientific knowledge showing that the areas of a person's brain affecting judgment and decision-making continue to develop at least through the age of 25.[3] That is the reason for which section 3051 was

---

[3] See also Arnett, Emerging Adulthood: The Winding Road from the Late Teens Through the Twenties (2d ed. 2015) pages 266–270 ("[A] wide variety of behavioral problems and psychological disorders reach their peak during the emerging adult years. No other stage of life has such high rates of so many different problems. The exuberance and the problems coexist, making emerging adulthood an exceptionally complex life stage, psychologically. . . . [¶] . . . [A]rrest rates rise sharply in the late teens and then remain high in the early twenties before declining steeply in the late twenties, the thirties, and beyond. . . . [¶] . . . The late teens and early twenties are the nadir of what criminologists call *social control,* meaning the roles, duties, relationships, and daily obligations that promote socially responsible behavior and discourage violations of social norms. Low social control allows for the expression

adopted and by successive amendments extended to apply first to offenders up to 23 years of age and then to those up to age 25. What then is the rational basis for categorically excluding offenders between 18 and 25 sentenced to LWOP from the scope of section 3051?[4]

According to the majority in *Jackson,* "the difference in the underlying crimes, and the fact that special circumstance murder is punished more harshly, provide a rational reason for distinguishing between the two groups of first degree murderers." (*Jackson, supra,* 61 Cal.App.5th at p. 200.) *Jackson, Acosta,* and the majority here agree that "the severity of the crime and the offender's culpability provide a rational basis for the differing treatment." (Maj. opn., *ante,* p. 38.) But this explanation is no explanation at all. We start with the fact that LWOP is a harsher sentence than life with the possibility of parole, presumably imposed because of the nature of the offense; the question is why it is, or may be thought to be, rational to exclude persons on whom such a sentence has been imposed from the scope of a measure designed to evaluate whether a person who committed a serious offense before attaining psychological maturity has, during a lengthy period of incarceration, been rehabilitated. To say that the reason is because

---

of the other tendencies that inspire crime among young males, such as aggressiveness and impulsiveness.")

[4] See Justice Liu's concurring statement in *People v. Montelongo, supra,* 55 Cal.App.5th at p. 1041 ("In light of the high court's clear statement that the mitigating attributes of youth are not 'crime-specific' [citation] and our Legislature's recognition that those attributes are found in young adults up to age 25, it is questionable whether there is a rational basis for section 3051's exclusion of 18 to 25 year olds sentenced to life without parole.")

such a person received a harsher sentence for a more aggravated offense is entirely circular.

The reference in the opinions to greater "culpability" adds little. Greater fault may justify a harsher sentence but it does not explain why a youthful LWOP offender who has been rehabilitated should remain imprisoned beyond the number of years after which a rehabilitated non-LWOP youthful offender sentenced to life imprisonment may be considered for parole. Moreover, those sentenced to LWOP under section 190.2 are not necessarily more culpable than those sentenced to life with the possibility of parole. Some of the "special circumstances" listed in section 190.2 involve less culpability than other premeditated murders for which no special circumstance applies. For example, in *People v. Montelongo*, *supra,* 55 Cal.App.5th 1016, the defendant was convicted of felony murder for a killing that occurred during the course of a robbery. As Justice Segal observed in his concurring opinion, "under section 3051, a young adult sentenced to an indeterminate prison term for premeditated first degree murder has an opportunity for parole, whereas Montelongo, who may not have intended to kill Brooks but was subject to a mandatory sentence of life without the possibility of parole . . . does not." (*Id.* at p. 1039 (conc. opn. of Segal, J.).) In the present case, Morales was found to have committed a multiple murder because the primary victim, who apparently was not even the person he intended to kill, happened to be pregnant. While the fact that in the eyes of the law two persons were killed may justify a more severe sentence, the fact that the primary victim was pregnant hardly increases the malignancy of his state of mind.

The exclusion of youthful LWOP offenders from the scope of section 3051 is also rationalized on the ground that such persons may be assumed to be " 'sufficiently dangerous to justify lifetime incarceration.' " (E.g., *Acosta, supra,* 60 Cal.App.5th at p. 780, quoting *In re Williams, supra,* 57 Cal.App.5th at p. 436.) Even assuming the rationality of this explanation as to some of the special circumstances (e.g., torture murder (§ 190.2, subd. (a)(18)) or murder prompted by racial hatred (§ 190.2, subd. (a)(16))), it is completely irrational as to others. Morales's special circumstance, for example, was the commission of a double murder, which applied only because his victim was pregnant—hardly a sign of increased dangerousness. Moreover, even as to the most egregious offenders, their exclusion on this basis is essentially irrational because section 3051 provides a parole hearing to determine whether after years of incarceration the offender has been rehabilitated and no longer poses a danger to others. Those considered by the parole board to remain a danger remain incarcerated. There is no logic to denying parole consideration to one who may be found no longer to pose a danger based on the rationale that continuing dangerousness is implied by conviction for an offense committed years ago, prior to psychological maturation.

Moreover, other factors increase the irrationality of excluding LWOP youth offenders from the scope of section 3051. It is within the exclusive discretion of the prosecuting attorney to determine whether to charge a special circumstance that will deny the offender an opportunity for eventual parole consideration. Differences in temperament, philosophy, or politics among prosecutors lead to inconsistency in making this critical decision. Racial or class bias may

7

also affect the determination of whether to charge a special circumstance. (See Smith and Levinson, *The Impact of Implicit Racial Bias on the Exercise of Prosecutorial Discretion* (2012) 35 Seattle U. L.Rev. 795; Davis, *Racial Fairness in the Criminal Justice System: The Role of the Prosecutor* (2007) 39 Colum. Hum. Rts. L.Rev. 202.) At present, the trial court has no authority to strike the special circumstance finding where appropriate, as it once had. The inevitable differences between prosecuting authorities result in inconsistency between those youthful offenders serving life sentences who are and who are not entitled to eventual parole consideration, regardless of the relative severity of their offenses and regardless of the extent to which they have outgrown and overcome the deficiencies in temperament and judgment that led to their offenses years in the past. While the differences among prosecuting authorities may be unavoidable, there is no necessity, nor any good reason, to perpetuate the resulting sentence disparities in a statute designed to reevaluate past offenders under common criteria for parole suitability.

Still more, the threat of pleading a special circumstance may be used by prosecutors to induce a guilty plea, regardless of the severity of the crime. And if a youthful offender refuses to plead and is convicted of the crime and the special circumstance, that offender will be denied the parole consideration to which he or she would have been entitled had the plea agreement been accepted. But whether a defendant is willing to forego the constitutional right to a jury trial is no measure of the defendant's culpability (indeed, there may be an inverse correlation) or likelihood of reforming, yet in practice that decision determines

whether the youthful offender will ever be entitled to parole consideration.

What is at stake is not any person's right to parole, to which some youthful offenders may never become entitled under the demanding criteria for release on parole. What is in question is only the right of a youthful offender such as Morales eventually to be evaluated to determine whether over an extended period of imprisonment and the development of cognitive and emotional maturity he has become worthy of release at no risk to the public. In my view, denying him that right, while affording it to other youthful offenders sentenced to life imprisonment, is irrational and a denial of equal protection.

POLLAK, P. J.

Trial Court:        Contra Costa County Superior Court

Trial Judge:        Hon. Rebecca C. Hardie

Counsel:

Shannon Case, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Katie L. Stowe, Elizabeth W. Hereford, Deputy Attorneys General for Plaintiff and Respondent.